**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

The ESTATE OF MICHAEL BURCH, by and through personal representative Linda McMillan,

Plaintiff,

v.

The BOARD OF COUNTY COMMISSIONERS FOR THE COUNTY OF HUERFANO, a municipality;
HUERFANO COUNTY SHERIFF'S OFFICE, a governmental entity;
SHERIFF BRUCE NEWMAN, in his official capacity as Huerfano County Sheriff;
DETENTION OFFICER STUART PINO, in his individual capacity;
CAPTAIN LEA VIGIL, in her individual capacity;
CAPTAIN BILLY LAPORTE, in his individual capacity;
HUERFANO COUNTY HOSPITAL DISTRICT D/B/A SPANISH PEAKS REGIONAL HEALTH CENTER, a governmental entity;
PARAMEDIC SAM TRUJILLO, in his individual capacity;
PARAMEDIC GABRIEL MARTINEZ, in his individual capacity;
HEALTH CARE PARTNERS FOUNDATION, INC., a corporation;
CERTIFIED NURSE AIDE SHANENE SANDERS, in her individual capacity;
REGISTERED NURSE RACHAEL SIMPSON, in her individual capacity; and
NURSE PRACTITIONER JENNIFER GREEN, in her individual capacity,

Defendants.

_____

**COMPLAINT AND JURY DEMAND**
_____

The Estate of Michael Burch, by and through attorneys Omeed M. Azmoudeh, Felipe Bohnet-Gomez, Matthew Cron, Stephanie Wise, and Katie Wiese Valiant of RATHOD | MOHAMEDBHAI LLC and Adam J. Schultz of The Law Office of Adam J. Schultz, alleges as follows:

## I. INTRODUCTION



*Figure 1: The Life and Senseless Death of Michael Burch*

1. This civil rights action concerns the torture and killing of Michael John Burch, a pre-trial detainee housed at the Huerfano County Detention Center.

2. Mr. Burch served as a detention officer in the California Department of Corrections and Rehabilitation for twenty-three years. After retiring in 2007, he moved to Huerfano County, only to be killed by those he had known as his peers.

3. On March 25, 2023, Mr. Burch was taken into custody at the age of 69, in the midst of a mental health crisis, but otherwise in good physical health.

4. Three days later, on March 28, 2023, Detention Officer Stuart Pino pummeled Mr. Burch into a metal bench for holding a pencil that had been given to him by a different

guard. Officer Pino broke six of Mr. Burch's ribs, puncturing several organs, and causing massive internal bleeding.

5.      Huerfano County Sheriff's Office Captain Lea Vigil, who was the supervisor on scene, has since admitted that the circumstances did not require any force, let alone brutal violence.

6.      Immediately after the excessive force, Mr. Burch pleaded with Defendants, "**my ribs are crushed … all the ribs are into my body**." And when asked about a hospital visit, Mr. Burch stated clearly, "**oh yeah, man, I want to go**."

7.      Instead of providing medical care to Mr. Burch, Defendants called him "**batshit**," locked him in a cell, and covered the cell window with black plastic so that they could save themselves the inconvenience of watching him suffer.

8.      In the days that followed, once the black plastic covering the cell window was finally removed, Defendants described Mr. Burch as "**a different person**." He suddenly struggled to walk, made additional explicit statements regarding his injuries and pain, and continued to plead for medical care, among other signs indicative of the ongoing, urgent need for medical attention.

9.      A visual examination—let alone an x-ray—would have revealed obvious signs of his fractured ribs, including the blood hemorrhaging into his body that had quickly manifested into a black bruise spanning the entirety of his lower torso.

10.     Nevertheless, Defendants persisted in providing Mr. Burch with no medical care whatsoever.

11.     As his pleas for medical attention went unanswered, Mr. Burch realized that he would die in his cell. Thus, on the evening of April 3, 2023, Mr. Burch literally created a

deathbed for himself by putting his jail-issued mattress on the concrete floor of his cell and pulling the sheets over himself. He was pronounced dead in the early morning hours of April 4, 2023.

12.     Between March 28 and April 4, 2023, Defendants **both caused and failed to treat Mr. Burch's life-ending injuries** as he experienced approximately 160 hours of unfathomable pain. The simple act of breathing became so painful as Mr. Burch's shattered ribs continued to pierce and tear through his organs that his body stopped using his right lung, which shrank to half the normal size. In other words, Mr. Burch's body chose to reduce the pain of breathing by opting to slowly suffocate over eight days.

13.     This lawsuit seeks accountability and justice under the Fourteenth Amendment to the United States Constitution, among other laws, in a scenario where an elderly man walked into jail with no injuries but never walked out, due solely to Defendants' unlawful actions.

## II. JURISDICTION AND VENUE

14.     This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

15.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All events and omissions alleged herein occurred within the District of Colorado.

16.     Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367 because the violations of federal law alleged are substantial, and the pendent causes of action derive from a common nucleus of operative facts.

### III. PARTIES

### *Plaintiff*

17.     The decedent, Michael John Burch, was a citizen of the United States and domiciled in the State of Colorado. Linda McMillan was appointed as Personal Representative of Plaintiff Estate of Michael John Burch on May 18, 2023.

### *Defendants*

18.     Defendant Board of County Commissioners for the County of Huerfano ("Huerfano County") is a local governmental entity organized under Colorado law and a proper entity to be sued under 42 U.S.C. § 1983. Huerfano County is responsible for the Huerfano County Sheriff's Office and Huerfano County Detention Center ("HCDC").

19.     Defendant Huerfano County Sheriff's Office ("HCSO") is a governmental arm of Huerfano County and a proper entity to be sued under 42 U.S.C. § 1983. The HCSO operates the HCDC.

20.     Defendant Huerfano County Sheriff Bruce Newman, in his official capacity, is a proper person to be sued under 42 U.S.C. § 1983. Sheriff Newman is the final policymaker responsible for the HCSO and HCDC.

21.     Huerfano County, the HCSO, and Sheriff Newman in his official capacity are referred to collectively as the "Huerfano County Defendants."

22.     At all times relevant to the subject matter of this lawsuit, Defendant Detention Officer Stuart Pino was a citizen of the United States, a resident of Colorado, an employee of the Huerfano County Defendants, and acting under color of state law.

23.     At all relevant times, Officer Pino was a noncertified deputy sheriff as described in section Colo. Rev. Stat. § 16-2.5-103(2). Consequently, Officer Pino was a peace officer as defined by Colo. Rev. Stat. § 24-31-901(3).

24.     In May of 2023, the Huerfano County Defendants promoted Officer Pino to Lieutenant.

25.     At all times relevant to the subject matter of this lawsuit, Defendant Detention Officer Stuart Pino was acting within the scope of his employment as a peace officer.

26.     At all times relevant to the subject matter of this lawsuit, Defendant Captain Lea Vigil was a citizen of the United States, a resident of Colorado, an employee of the Huerfano County Defendants, and acting under color of state law.

27.     At all relevant times, Captain Vigil was a noncertified deputy sheriff as described in section Colo. Rev. Stat. § 16-2.5-103(2). Consequently, Captain Vigil was a peace officer as defined by Colo. Rev. Stat. § 24-31-901(3).

28.     At all times relevant to the subject matter of this lawsuit, Captain Vigil was acting within the scope of her employment as a peace officer.

29.     At all times relevant to the subject matter of this lawsuit, Defendant Captain Billy LaPorte was a citizen of the United States, a resident of Colorado, an employee of the Huerfano County Defendants, and acting under color of state law.

30.     At all relevant times, Captain LaPorte was POST certified and therefore was a peace officer as defined by Colo. Rev. Stat. § 24-31-901.

31.     At all times relevant to the subject matter of this lawsuit, Defendant Captain LaPorte was acting within the scope of his employment as a peace officer.

32.    Officer Pino, Captain Vigil, and Captain LaPorte are referred to collectively as the "Officer Defendants."

33.    Defendant Huerfano County Hospital District d/b/a Spanish Peaks Regional Health Center ("Spanish Peaks") is a governmental entity organized under Colorado law and is a proper entity to be sued under 42 U.S.C. § 1983. At the time of the events and omissions giving rise to this lawsuit, Spanish Peaks was responsible for emergency paramedic services at the HCDC.

34.    At all times relevant to the subject matter of this lawsuit, Defendant Paramedic Sam Trujillo was a citizen of the United States, a resident of Colorado, an employee of Spanish Peaks, and acting under color of state law. At all times relevant to the subject matter of this lawsuit, Defendant Paramedic Sam Trujillo was acting within the scope of his employment as a public employee.

35.    At all times relevant to the subject matter of this lawsuit, Defendant Paramedic Gabriel Martinez was a citizen of the United States, a resident of Colorado, an employee of Spanish Peaks, and acting under color of state law. At all times relevant to the subject matter of this lawsuit, Defendant Paramedic Gabriel Martinez was acting within the scope of his employment as a public employee.

36.    Paramedics Trujillo and Martinez are referred to collectively as the "Paramedic Defendants."

37.    Defendant Health Care Partners Foundation, Inc. ("Health Care Partners") is a private nonprofit corporation with a principal address of 1411 W US Highway 50, No 1040, Pueblo, CO 81008, United States. At the time of the events and omissions giving rise to

this lawsuit, the Huerfano County Defendants contracted, via express written agreement, for Health Care Partners to provide medical services at the HCDC.

38.    At all times relevant to the subject matter of this lawsuit, Defendant Certified Nurse Aide Shanene Sanders was a citizen of the United States, a resident of Colorado, an employee of Health Care Partners, and acting under color of state law.

39.    At all times relevant to the subject matter of this lawsuit, Defendant Certified Nurse Aide Shanene Sanders was acting within the scope of her employment as a delegee to perform the traditional state function of providing medical care to inmates and detainees in a jail.

40.    At all times relevant to the subject matter of this lawsuit, Defendant Registered Nurse Rachael Simpson was a citizen of the United States, a resident of Colorado, an employee of Health Care Partners, and acting under color of state law.

41.    At all times relevant to the subject matter of this lawsuit, Defendant Registered Nurse Rachael Simpson was acting within the scope of her employment as a delegee to perform the traditional state function of providing medical care to inmates and detainees in a jail.

42.    At all times relevant to the subject matter of this lawsuit, Defendant Nurse Practitioner Jennifer Green was a citizen of the United States, a resident of Mississippi, and acting under color of state law as an employee or subcontractor of Health Care Partners.

43.    At all times relevant to the subject matter of this lawsuit, Defendant Nurse Practitioner Jennifer Green was acting within the scope of her employment as a delegee

to perform the traditional state function of providing medical care to inmates and detainees in a jail.

44.    CNA Sanders, RN Simpson, and NP Green are collectively referred to as the "Medical Staff Defendants."

## IV.  FACTUAL ALLEGATIONS

### A. Michael Burch's Life



*Figure 2: Michael John Burch*

45.    Michael John Burch was born in Michigan on May 18, 1953, and spent his childhood playing baseball before his family moved to California where he developed a true passion for surfing.

46.    In 1985, Mr. Burch began a career in correctional law enforcement, working as a cadet in the California Department of Corrections and Rehabilitation ("CDCR").

47.    In 1999, Mr. Burch transferred from the jails to the CDCR Correctional Training Facility in Soledad, California, where he dedicated himself to training the next generation of correctional officers.

48.     After a twenty-three-year career in corrections, Mr. Burch retired as a Lieutenant in 2007, and eventually moved to Huerfano County, Colorado, enamored by the beauty of the State.

49.     Here, he would find himself behind bars, beaten and left dying by those whose job required them to provide care and safety, as Mr. Burch had himself done for countless incarcerated persons.

### B. When the Huerfano County Defendants Detained Mr. Burch, He Displayed Obvious Signs of a Mental Health Crisis but Did Not Have Any Physical Injuries.

50.     In March of 2023, the Huerfano County Defendants received several complaints regarding Mr. Burch in rapid succession.

51.     These complaints made obvious Mr. Burch's deteriorating mental health.

52.     Mr. Burch's neighbors called the Huerfano County Defendants to report that, in a departure from his usual kindness, Mr. Burch was suddenly acting and speaking erratically.

53.     Within the same week, the Huerfano County Defendants received a complaint accompanied by surveillance footage of Mr. Burch inside of a local bank, making incoherent complaints about fake $100 bills.

54.     On March 25, 2023, two brothers reported to the Huerfano County Defendants that Mr. Burch—who they had never met—pulled his truck into their driveway, rambled about various topics, swung a rubber mallet, and then drove away.

55.     That same day, Mr. Burch became involved in another incident at Spanish Peaks Hospital, where he complained to the receptionist regarding his rights as a veteran.

The receptionist informed the Huerfano County Defendants that she had worked with Mr. Burch before but had never seen him acting in this erratic way.

56.     Based on the mallet incident, the Huerfano County Defendants took Mr. Burch into custody in the afternoon of March 25, 2023, a sequence which continued to make obvious Mr. Burch's declining mental state.

57.     That afternoon, HCSO Captain Craig Lessar located Mr. Burch at the local O'Reily Auto Parts and executed a warrantless arrest.

58.     Captain Lessar described Mr. Burch as generally compliant during the arrest.

59.     However, Captain Lessar observed Mr. Burch easily lose touch with reality.

60.     Captain Lessar, in his words, quickly understood that "[Mr. Burch] was having some mental health issues."

61.     Captain Lessar also assisted the intake at HCDC and again described Mr. Burch during that process as "just kinda actin' crazy."

62.     On the same day, HCSO Deputy [FNU] Gonzales submitted an affidavit in support of the earlier warrantless arrest, which described Mr. Burch as "having some sort of uncontrollable mental issue" requiring treatment by "a mental health professional."

63.     Upon intake, nobody performed a medical screening of Mr. Burch.

64.     A medical screening would have resulted in Mr. Burch getting the mental healthcare that he needed.

65.     The HCSO Premedical Screening Form was left blank.

66.     Later on March 25, 2023, the Huerfano County District Court made a finding of probable cause, which altered Mr. Burch's status from arrestee to pretrial detainee.

67.    Between March 25 and March 28, 2023, Mr. Burch spent most of his time locked in Cell 100, where his mental health crisis continued to be obvious and untreated.

68.    For example, according to Captain Vigil, "[Mr. Burch was] kind of out of it ... ranted on about [] stuff we didn't knocw what he was talking about ... you could tell that he was kinda not all there mentally."

69.    Relatedly, Captain Vigil observed that Mr. Burch was not eating most of his food, which she concluded was typical behavior for detainees who "are mentally ill without having been on medication."

70.    HCSO Officer Francisco Lantis, who had less than a week of experience working at the HCDC, could tell that Mr. Burch was "mentally not all there."

71.    During these first three days in custody, again, nobody performed a medical screening of Mr. Burch.

72.    CNA Sanders wrote in a medical report that she needed a two-officer escort to perform a medical screening.

73.    Nobody arranged for a two-officer escort to perform the medical screening.

74.    In contrast to his mental health, Mr. Burch was taken into custody without any physical injuries.

75.    Mr. Burch had no trouble standing or walking.

76.    Mr. Burch did not complain of any pain.

### C. Officer Pino Tases Mr. Burch and Breaks His Ribs During an Encounter That Did Not Justify Any Force.

77.    On March 28, 2023, HCSO Officer Austin Maddox told Officer Pino that it appeared from the surveillance camera that Mr. Burch was making "cutting" motions with a small pencil.

78.    At that time, Officer Maddox had less than a week of experience working at the HCDC.

79.    Based on that report, Officer Pino and Captain Vigil walked to Cell 100 to check on Mr. Burch.

80.    When they arrived to Cell 100, there was no reason to believe that Mr. Burch posed any substantial risk of self-harm or harm to others.

81.    Mr. Burch had not harmed or attempted to harm himself with the pencil at any time during the prior few days that he possessed a pencil.

82.    Indeed, an unknown HCSO detention officer had given Mr. Burch the pencil and a notepad for self-soothing.

83.    Mr. Burch had been using the pencil to write notes.

84.    Surveillance footage from Cell 100 does not show Mr. Burch making cutting motions at any time.

85.    When the officers arrived at Cell 100, Officer Pino saw Mr. Burch holding the pencil but did not observe Mr. Burch say or do anything indicating that Mr. Burch intended to harm himself with the pencil.

86.    When the officers arrived to Cell 100, Mr. Burch was alone and locked in the cell, meaning Mr. Burch could not have harmed Officer Pino, Captain Vigil, or any other third person.

87.    When the officers arrived to Cell 100, the circumstances did not justify the use of any force.

88.    Captain Vigil has since admitted that the circumstances did not justify any use of force.

89.    At most, the circumstances justified a wellness check.

90.    Any reasonable officer in the circumstances would have allowed Mr. Burch to maintain possession of the pencil while continuing to monitor him for potential self-harm.

91.    Even with the tenuous assumption that Officer Pino had a legitimate interest in removing the pencil from Mr. Burch's possession, the reasonable way to accomplish that objective would have been to employ any number of de-escalation techniques from outside the cell.

92.    A de-escalation effort, rather than an aggressive, threatening, or violent approach, was needed given Mr. Burch's compromised mental state.

93.    Officer Pino knew of Mr. Burch's compromised mental state or otherwise consciously disregarded that obvious fact.

94.    In such circumstances, any reasonable officer would have known that the use of threats, aggression or violence is reckless and likely to create the need for more force.

95.    Mr. Burch could have slid the pencil through the food port of the cell door.

96.    Captain Vigil later acknowledged that there were "other means" to obtain the pencil.

97.    Despite no substantial risk of self-harm, no possible risk of harm to anyone else, and the obvious need to avoid recklessly escalating the encounter, Officer Pino and Captain Vigil chose to employ threats, aggression, and violence against Mr. Burch.

98.    Neither Officer Pino nor Captain Vigil made any efforts to temper the severity of their response to Mr. Burch.

99.    Upon arrival to Cell 100, Officer Pino immediately shouted at Mr. Burch, "you going to try to stab somebody?"

100.    Mr. Burch had made no such threat.

101.    Nor was anyone else in Cell 100 with Mr. Burch who he could conceivably endanger.

102.    Within ten seconds, Officer Pino unlocked and opened the cell door, pointed his taser at Mr. Burch, and began shouting orders and threats at Mr. Burch.

103.    Officer Pino threatened Mr. Burch: "You ready? Drop the pencil now! **Drop it, or we'll drop you**!"

104.    Captain Vigil stood behind Officer Pino with her taser also drawn.

105.    Mr. Burch continued standing in the corner of the cell, saying nothing and not threatening resistance.

106.    Taser still drawn, Officer Pino entered the cell and backed Mr. Burch into a corner while continuing to yell commands.

107.    Meanwhile, Mr. Burch made no verbal threats, made no aggressive movements, and did not advance in any way towards the officers.

108.    Unprompted, and without further warning, Officer Pino fired his taser at Mr. Burch.

109.    **After** Officer Pino fired his taser, Mr. Burch raised his hands into the air and slowly moved towards Officer Pino.

110.    Predictably, Officer Pino's reckless tasing had caused Mr. Burch to attempt this minor act of self-defense.

111.    As Mr. Burch stumbled forward, Officer Pino grabbed both of Mr. Burch's hands out of the air.

112.    Officer Pino's ability to grab both of Mr. Burch's hands is reflective of how slowly the sixty-nine-year-old Mr. Burch was moving.

113.    Officer Pino then tackled Mr. Burch into a metal bench in the back of the cell with enough force to break six of his ribs, puncturing several organs, and causing significant internal bleeding.

114.    These injuries caused Mr. Burch's death one week later.

115.    During the entire sequence, Captain Vigil stood right behind Officer Pino.

116.    Specifically, Captain Vigil witnessed Officer Pino threaten Mr. Burch, become aggressive towards Mr. Burch, tase Mr. Burch without warning, and slam him into a metal bench.

117.    Officer Pino's force against Mr. Burch was objectively unreasonable and therefore excessive.

118.    Officer Pino recklessly created the need for more force by employing an aggressive, threatening, and violent approach to circumstances involving an individual who was obviously experiencing a mental crisis and did not pose any threat.

119.    The entire sequence described herein—from Officer Pino arriving to Cell 100 to then breaking Mr. Burch's ribs—spanned no more than 40 seconds.

120.    Officer Pino employed force so rapidly that Mr. Burch did not have enough time to even comprehend the circumstances.

121.    Beyond objectively unreasonable and therefore excessive, Officer Pino's force was also objectively and subjectively punitive.

122.    Using violence against a mentally ill individual who poses no risk of harm is not rationally related to any legitimate government interest.

123.    Referring to the surveillance footage of his assault of Mr. Burch, Officer Pino stated, "I hope we got a good view."

### D. Immediately After the Use of Force, Defendants Continued to Use Unreasonable Force and Disregarded Mr. Burch as He Explicitly Stated His Injuries and Begged for a Hospital Visit.

124.    Officer Pino instantly knew that he tackled Mr. Burch into a metal bench.

125.    More specifically, based on the location of the bench in the cell, Officer Pino knew that Mr. Burch's ribs had hit the metal bench.

126.    Indeed, Officer Pino drafted a use of force report that same day and noted an injury to Mr. Burch's "right ribs."

127.    Officer Pino did not learn about the rib injury from extraneous sources—he had firsthand knowledge of Mr. Burch's rib injury upon impact and noted that injury in his report.

128.    Knowing immediately that he injured Mr. Burch's ribs, Officer Pino later admitted that he should have notified responding paramedics and jail medical staff accordingly.

129.    Officer Pino, however, did not notify anyone about the injury to Mr. Burch's "right ribs."

130.    Instead, just after the use of force, Officer Pino handcuffed Mr. Burch.

131.    Mr. Burch was compliant and offered no resistance to being handcuffed.

132.    Before being handcuffed, Mr. Burch had already dropped the pencil.

133.    Officer Pino then rolled Mr. Burch onto his right side—the side that was injured.

134.    After some time, Mr. Burch began to flinch from the pain of lying on his broken ribs.

135.    In response, Officer Pino kneed Mr. Burch and forcibly pressed on Mr. Burch, squeezing Mr. Burch's torso with his body weight.

136.    Officer Pino was a large man of considerable weight.

137.    The weight of Officer Pino forcibly pressing on top of Mr. Burch's broken ribcage caused Mr. Burch further injury.

138.    Mr. Burch screamed in excruciating pain.

139.    Officer Pino and Captain Vigil mocked and made fun of Mr. Burch's agony.

140.    CNA Shanene Sanders arrived at Cell 100 around this time.

141.    Captain Vigil told Mr. Burch, "The disrespect is not going to be tolerated."

142.    Captain Vigil told Mr. Burch, "I'm pretty sure you're going straight to hell."

143.    Officer Pino asked Mr. Burch, "Dude, you didn't learn your lesson the first time?"

144.    Between screams of pain, Mr. Burch pleaded for help.

145.    Officer Pino continued using force to press Mr. Burch's broken ribcage to the floor while Captain Vigil and CNA Sanders idly stood by, observing the clear indications of Mr. Burch's serious pain and injuries.

146.    Officer Pino's continued use of force caused Mr. Burch further injury.



*Figure 3: Officer Pino Presses His Knee On Mr. Burch's Broken Ribcage*

147.    Captain Vigil instructed Officer Pino, "If he doesn't want to comply, you keep that knee in his back."

148.    Officer Pino replied to Captain Vigil, "Yep! I'll keep it right here."

149.    Mr. Burch's arms were handcuffed behind his back and he was on the floor.

150.    Mr. Burch was not resisting.

151.    Mr. Burch was no longer holding a pencil.

152.    Mr. Burch did not pose a threat to the officers or to the facility's security.

153.    As Officer Pino forcibly pinned Mr. Burch to the floor, Officer Pino recounted how he had tackled Mr. Burch onto the metal bench and stated, "**Well, I guess I got my itch scratched**," chuckling.

154.    Under the circumstances, it was not objectively reasonable to continue using any force against Mr. Burch.

155.    Mr. Burch's screams were notably louder when Officer Pino held Mr. Burch with his right side pressed into the ground than when Officer Pino held Mr. Burch with his stomach on the ground.

156.    During this time, no one did anything to assess or treat Mr. Burch's injuries.

157.    CNA Sanders stood inside Cell 100 holding a vital sign monitor.

158.    CNA Sanders did not take Mr. Burch's vital signs or undertake any other medical assessment, nor did she provide any other medical care.

159.    Instead, Captain Vigil looked at CNA Sanders, used her finger to make a circle gesture near her ear, and called Mr. Burch "batshit."

160.    Captain Vigil communicated to CNA Sanders that Mr. Burch's screams of pain and pleas for help should be disregarded because of his mental health.



*Figure 4: Captain Vigil Calling Mr. Burch "Batshit" as He Screams in Pain*

161.    Minutes later, Paramedics Trujillo and Martinez arrived at Cell 100 and began a conversation with Mr. Burch ostensibly to assess his injuries.

162.    Captain Billy LaPorte also entered the cell around the same time as the Paramedic Defendants.

163.    Captain LaPorte is assigned to the HCSO patrol division, but he reported to the HCDC for this particular incident.

164.    Throughout the Paramedic Defendants' conversation with Mr. Burch, Captain LaPorte and Officer Pino remained inside the cell, while Captain Vigil and CNA Sanders stood closer to the doorway, well within earshot.



*Figure 5: Officer Pino (L) and Captain LaPorte (Bodycam) Standing*
*Inside Cell 100 During Paramedic Defendants' Conversation with Mr. Burch*



*Figure 6: Nurse Sanders and Captain Vigil Standing Closer to the Doorway*
*During the Paramedic Defendants' Conversation with Mr. Burch*

165.    Upon arrival, Paramedic Martinez said to Mr. Burch, "I'm sorry that you got tackled."

166.    Paramedic Martinez said: "Are you hurt anywhere?"

167.    Mr. Burch responded: "Yeah. My right side. **Rib cage**."

168.    Paramedic Trujillo asked: "Okay. You just hurt on that right side?"

169.    Mr. Burch explained: "**It's crushed.**"

170.    Paramedic Trujillo asked: "do you want to go to the hospital today?"

171.    Mr. Burch responded: "**Oh yeah, man I want to go**. Pick me up. Pick me up. On my feet. Please. On my feet. Please."

172.    Mr. Burch repeated: "It's just the right side. **My ribs are crushed**."

173.    Mr. Burch turned to the side, winced, and said: "The pain is really coming guys. Get me out of here please."

174.    Mr. Burch said for a third time: "**Right side. Crushed. All the ribs are are into my, my, my body.**"

175.    Mr. Burch complained of serious pain, stated that his ribs were crushed at least three times, and pleaded to go to the hospital.

176.    Mr. Burch told the Paramedic Defendants they could help him.

177.    Mr. Burch told the Paramedic Defendants they could examine him.

178.    Mr. Burch told the Paramedic Defendants they could take him to the hospital.

179.    Despite Mr. Burch unequivocally stating his injuries and requesting to go to the hospital, the Paramedic Defendants stated that this was "absolutely not" a medical emergency and that Mr. Burch was "fine."

180.    The Paramedic Defendants made that diagnosis even though they did not perform an x-ray, listen to his lungs or chest with a stethoscope, or even take his vitals.

181.    Officer Pino said, "I don't know if you want to take a look anywhere else because he was tackled."

182.    When Captain Vigil asked Officer Pino if he banged anything, Officer Pino responded, "I mean, him, technically," referring to the fact that Officer Pino had injured Mr. Burch.

183.    The Paramedic Defendants departed the HCDC without Mr. Burch.

184.    The Paramedic Defendants did not obtain any direct verbal orders from their medical director (a physician) in making decisions during the encounter with Mr. Burch.

185.    The Paramedic Defendants later issued medical reports, which credit Mr. Burch with stating that his "chest hurts."

186.    Mr. Burch never complained of chest pain.

187.    The reports do not reflect Mr. Burch's actual, repeated complaints regarding his "crushed ribs."

188.    In their medical reports, the Paramedic Defendants also credit Mr. Burch with stating: "I just want out of this fuckin' place."

189.    Mr. Burch made no such statement.

190.    Instead, Mr. Burch had pleaded to go to the hospital for immediate medical care because his ribs were "crushed" and were "into" his body.

191.    As the Paramedic Defendants left the HCDC, Officer Pino, Captain LaPorte, Captain Vigil, and CNA Sanders can be heard thanking the Paramedic Defendants for their work.

192.    Officer Pino, Captain LaPorte, Captain Vigil, and CNA Sanders did not ask the Paramedic Defendants to take Mr. Burch to the hospital despite his unambiguous complaints and anguished cries, as well as their own knowledge that an elderly man had just been tackled onto a metal bench with sharp, hard corners.

193.    Captain LaPorte had stated to the paramedics that HCSO officers would arrange for a Health Care Partners staff member, *i.e.*, one of HCDC's in-house medical providers, to perform an additional evaluation.

194.    Captain LaPorte had pointed to CNA Sanders and stated, "We've got medical here. She can do an assessment. And then if she makes a decision that we have to take him to the hospital, we'll let her do that."

195.    Thus, Officer Pino, Captain Vigil, and CNA Sanders understood that a Health Care Partners staff member, including CNA Sanders herself or one of her colleagues, should perform an additional evaluation.

196.    But Captain LaPorte, Officer Pino, and Captain Vigil did not arrange for any evaluation by Health Care Partners staff.

197.    CNA Sanders did not provide or arrange for any assessment of Mr. Burch's injuries, nor did she provide any medical care to Mr. Burch.

198.    To the contrary, as soon as the Paramedic Defendants departed the HCDC, Officer Pino, Captain LaPorte, and Captain Vigil moved Mr. Burch into a nearby cell, Cell 101, and locked him up.

199.    CNA Sanders went elsewhere.

200.    Officer Pino, Captain LaPorte, and Captain Vigil then covered the Cell 101 window with black plastic, making it impossible to effectively monitor Mr. Burch.



*Figure 7: Captain LaPorte Covering the Top Window of the Cell 101 Door*

### E. HCSO Officers and Health Care Partners Staff Disregarded Mr. Burch's Worsening Condition Throughout the Eight Days Leading to His Death.

201.    Between March 28, 2023, the day Officer Pino broke Mr. Burch's ribs, and April 4, 2023, the morning Mr. Burch died, Mr. Burch made additional explicit statements regarding his injuries, became extremely subdued or docile, and displayed several other signs indicative of the continuing need for medical attention.

202.    Most prevalent, within hours of the use of force, the blood pooling in Mr. Burch's body manifested into an ominous black bruise that any layperson would easily recognize as requiring medical attention.

203.    The black bruise eventually spanned the entirety of Mr. Burch's lower right torso. *See* Fig. 1.

204.    Between March 28, 2023 and April 4, 2023, Captain Vigil, Officer Pino, CNA Sanders, and RN Simpson observed Mr. Burch's worsening condition from HCDC surveillance cameras, which provided a live view with audio of the door and window of Cell 101.

205.    However, Captain Vigil, Officer Pino, CNA Sanders, and RN Simpson made these observations only during the times when they chose to remove the black plastic from his cell window, *i.e.*, only during the times when they chose not to purposefully blind themselves to Mr. Burch's condition.

206.    Captain Vigil, Officer Pino, CNA Sanders, and RN Simpson also observed Mr. Burch's worsening condition during meal distributions, pod checks, med passes, and other routine daily interactions as they moved about the HCDC.

207.    Captain Vigil observed that Mr. Burch became "a different person" over those eight days.

208.    Similarly, Officer Pino admitted that Mr. Burch's "whole demeanor changed."

209.    About two hours after Officer Pino's use of force, Mr. Burch was in immense pain, so he dragged himself across the floor, banged on the bottom window, and screamed the word "help" for several minutes. Nobody responded.

210.    This maneuver—scooting across the floor—became the primary way in which Mr. Burch moved about his cell over the course of several days, up until his death.

211.    In the rare moments Mr. Burch would walk, he did so with a belabored limp.

212.    Prior to March 28, 2023, Mr. Burch did not scoot or limp. He walked normally.

213.    Three hours after Mr. Burch pleaded for "help" in his cell, at approximately 5:14 p.m. on March 28, 2023, Captain Vigil arrived outside Cell 101, removed the black plastic, and through the door asked, "Did you need something?"

214.    Mr. Burch responded: "Water and pain."

215.    Captain Vigil replied: "I can get you some water, **but I can't give you anything for the pain**."

216.    Captain Vigil dropped a water bottle through the hatch, but Mr. Burch could not stand up to retrieve it.

217.    Captain Vigil again covered the cell window with black plastic and walked away.

218.    At approximately 6:38 p.m. on March 28, 2023, Mr. Burch again requested treatment for his pain from Captain Vigil, and Captain Vigil again refused to provide any treatment or escalate Mr. Burch's medical care.

219.    By the afternoon of March 29, 2023, the officers had finally removed the black plastic from the window of Cell 101; however, the glass was cracked, hazy, and difficult to see through.

220.    Consequently, when Defendants were not using black plastic to purposefully blind themselves to Mr. Burch's worsening condition, they still chose to obscure their view of Mr. Burch by keeping him in a cell with an opaque window.

221.    Upon information and belief, cells with undamaged windows were available to house Mr. Burch.



*Figure 8: Barely Visible through the Opaque Window,*
*Mr. Burch Dragging Himself Across the Floor of His Cell*

222.    The choice to blind themselves from (or otherwise obscure their view of) a detainee who was complaining of serious injuries was particularly troubling given that Mr. Burch was often shirtless and sometimes completely naked in his cell, revealing the horrific bruising from the blood hemorrhaging into his body.

223.    For example, on March 31, 2023, Mr. Burch limped across the cell and stood shirtless within inches of the upper window.

224.    Indeed, Mr. Burch's bruising is visible even through the blurry window.



*Figure 9: Mr. Burch's Injuries Were Visible as He Stood Shirtless Near the Cell 101 Window on March 31, 2023*

225.    On April 1, 2023, Mr. Burch told Captain Vigil that he nearly died the previous night: "I almost didn't make it last night sweetheart."

226.    Mr. Burch again told Captain Vigil that his ribs "got crushed."

227.    Mr. Burch asked Captain Vigil for a medical visit.

228.    Upon information and belief, Mr. Burch described his injuries, complained of excruciating pain, and requested medical care on multiple other occasions in the days preceding his death.

229.    Two hours after asking for a medical visit, Captain Vigil, RN Simpson, and an unknown officer removed Mr. Burch from his cell for a teleconference visit with NP Jennifer Green.

230.   This teleconference visit was the first (and only) medical provider Mr. Burch had seen in the five days since his ribs were broken by Officer Pino.

231.   Captain Vigil, CNA Sanders, RN Simpson, and the unknown officer remained present in person with Mr. Burch during the teleconference visit with NP Green.

232.   NP Green, however, was in Mississippi and was not physically present with Mr. Burch.

233.   Captain Vigil failed to relay to NP Green that Mr. Burch had been repeatedly complaining of these injuries since he was tackled into a metal bench by Officer Pino on March 28, 2023.

234.   Instead, Captain Vigil told NP Green that Mr. Burch posed such a safety risk that the officers could not remove Mr. Burch's restraints to facilitate the medical visit.

235.   Captain Vigil's statement regarding the safety risk was demonstrably false and designed to prevent Mr. Burch from receiving adequate medical care.

236.   Surveillance footage before and after the medical visit shows Mr. Burch completely subdued and compliant, limping slowly throughout the jail without any restraints.

237.   During the teleconference visit, NP Green failed to perform even a visual examination—let alone order an x-ray—of Mr. Burch's torso.

238.   Further, NP Green offered several opinions about various body parts appearing normal, but given the sizeable black bruising, several broken ribs, and internal bleeding, Mr. Burch's injuries were, or should have been, obvious to NP Green.

239.   For instance, NP Green noted that Mr. Burch's abdomen was "symmetric without distention"—at the time, his abdomen housed six broken ribs and was black from bruising.

240.   A teleconference is obviously inadequate to properly assess traumatic injuries, including a patient's internal injuries from a rib fracture.

241.   NP Green did not provide any medical care for Mr. Burch's injuries.

242.   NP Green did not escalate Mr. Burch's care.

243.   NP Green's subsequent medical report, in which she repeatedly highlights Mr. Burch's alleged incoherent statements during the teleconference visit, reflects her agreement with the Officer Defendants' collective diagnosis: Mr. Burch was not injured; he was just "batshit."

244.   The records of the teleconference visit focus solely on Mr. Burch's mental health and contain no mention whatsoever of Mr. Burch's rib injury.

245.   NP Green thus either disregarded information from Captain Vigil, RN Simpson, and/or Mr. Burch himself about his injuries, or Captain Vigil and RN Simpson failed to escalate Mr. Burch's injuries before and during the teleconference visit.

246.   Captain Vigil and RN Simpson understood that NP Green did not treat Mr. Burch's broken ribs or further escalate his care.

247.   As Captain Vigil, RN Simpson, and the unknown officer escorted Mr. Burch from the medical visit back to his cell, they allowed him to take a shower, which presented yet another opportunity to look at the injuries he had repeatedly described.

248.    In the morning of April 2, 2023, an unknown officer and CNA Sanders arrived at Mr. Burch's cell for a med pass. CNA Sanders did not evaluate Mr. Burch's injuries or take his vitals.

249.    On April 3, 2023, Mr. Burch continued to do what he had done for the last several days: barely move about his cell.

250.    By the evening, Mr. Burch had lain on the floor in the center of the cell, and at 10:38 p.m., he attempted to sit up but collapsed. There was an audible thud as his head hit the cement.

251.    At midnight on April 4, 2023, Officer Lantis looked into Mr. Burch's cell. Despite Mr. Burch lying dead still in an abnormal position, without any rise and fall in his chest, Officer Lantis walked away without any further investigation.

252.    At 1:50 a.m. on April 4, 2023, Officer Michael Sanchez passed by Mr. Burch's cell while taking out the trash. He did not look into Mr. Burch's cell.

253.    Finally, at 4:40 a.m., more than six hours after Mr. Burch initially collapsed, Officer Sanchez looked into Cell 101 and tried to wake up Mr. Burch, checked his pulse, and eventually called over the radio: "this guy's frozen bro."

254.    The pod checks on April 3 and 4, 2023 are consistent with inadequate monitoring from the previous days. Captain Vigil, Officer Pino, CNA Sanders and RN Simpson monitored Mr. Burch infrequently, and even when instances of monitoring occurred, these same individuals sometimes did not even look into Mr. Burch's cell, let alone follow up on the obvious signs of his deteriorating health.

255.    In the morning of April 4, 2023, two paramedics arrived to the HCDC and pronounced Mr. Burch dead.

256.    Around the same time, Officer Sanchez explained to Sheriff Newman: "ever since the incident with Pino, he'd crawl ya know injured I guess."

257.    Officer Sanchez was not present during Officer Pino's use of force and the immediate aftermath.

258.    Officer Sanchez's statements to Sheriff Newman therefore reflect that there were ongoing discussions among staff members at HCDC, such that it was common knowledge that Officer Pino had slammed Mr. Burch into a metal bench and caused him crippling injuries.

259.    On April 7, 2023, Dr. Leon Kelly performed the autopsy and determined that Mr. Burch died "as a result of complications of blunt force trauma to the chest and abdomen," including "widely displaced fractures of right ribs 7-12"; "right hemothorax, 500 mL" (blood pooling into the hollow area between the lungs and ribcage); "atelectasis of the right lung" (a collapsed lung); and "copious hemorrhage within the distal small intestine and colon" (more blood pooling).

260.    In other words, Mr. Burch was correct that his ribs were crushed and were protruding "into" his body.

261.    Dr. Kelly determined that Officer Pino's brutal force was the cause of these injuries, and that the manner of death was a "homicide."

### F. Mr. Burch's Death, along with the Preceding Symptoms, Were Serious Medical Needs.

262.    Mr. Burch's death was objectively and sufficiently serious.

263.    Mr. Burch's preceding symptoms were also objectively and sufficiently serious as intermediate harms for at least two reasons.

264.    First, Mr. Burch's preceding symptoms—broken ribs, significant hemorrhaging, sizeable black bruising, sudden difficulty walking, and immense pain—would prompt a layperson to seek immediate medical attention.

265.    Broken ribs alone would prompt a layperson to seek immediate medical attention because *any* broken bones necessitate immediate medical attention and because broken *ribs* in particular pose the threat of several life-threatening complications.

266.    Second, Mr. Burch's preceding symptoms eventually turned fatal.

### G. The Paramedic Defendants, as Both Medical Providers and Gatekeepers, Disregarded a Known Risk of Harm to Mr. Burch.

267.    On March 28, 2023, the Paramedic Defendants became aware of a substantial risk to Mr. Burch's health and safety when Mr. Burch stated, accurately and repeatedly, that his ribs were "crushed," that his ribs were "into" his body, that he was in serious pain, and that he needed to go to the hospital. The Paramedic Defendants' own questions elicited Mr. Burch's statements.

268.    Adding to that awareness, the Paramedic Defendants understood that an able-bodied detention officer had just tackled an elderly man in a small cell rife with hard surfaces and jagged edges.

269.    Any unfamiliarity with the serious risk to Mr. Burch's health was the result of the Paramedic Defendants' deliberate refusal to monitor a risk that they suspected to be true. Indeed, the Paramedic Defendants' medical reports, which do not reflect Mr. Burch's actual complaints and accuse him of malingering in pursuit of a day of freedom at the hospital, indicate that the Paramedic Defendants were consciously ignoring Mr. Burch.

270.    Despite becoming aware of a substantial risk to Mr. Burch's health and safety, the Paramedic Defendants abrogated their duties as medical providers by providing no medical care whatsoever with respect to Mr. Burch's broken ribs and life-threatening complications.

271.    The Paramedic Defendants failed to perform even basic assessment procedures that would be standard for suspected rib injuries.

272.    For example, the Paramedic Defendants did not take Mr. Burch's vitals; did not listen to his lungs or heart with a stethoscope, which would have revealed abnormal sounds indicative of broken ribs and life-threatening complications; did not stabilize his injuries; and did not provide any form of pain management.

273.    The Paramedic Defendants' assertion that Mr. Burch's condition was "absolutely not" a medical emergency was completely unsupported by any objective indicia as they failed to perform a basic assessment and it was, of course, patently incorrect.

274.    The Paramedic Defendants knew that they lacked the training, experience, knowledge, and necessary medical equipment to make a diagnosis as to Mr. Burch's medical condition.

275.    The Paramedic Defendants also knew that they lacked the authority within their scope of practice to make such a diagnosis as to Mr. Burch's condition. *See, e.g.*, 6 CCR 1015-3 § 11.4 (authorizing paramedics to collect patient data "for the sole purpose of providing information to another health care provider" and instructing paramedics that such data collection "will not be used to alter the prehospital treatment or destination of

the patient without a direct verbal order," *i.e.*, an order given by a physician via "direct medical communications" or "in person").

276.    Despite becoming aware of a substantial risk to Mr. Burch's health and safety, the Paramedic Defendants abrogated their duties as gatekeepers by declining to transport Mr. Burch to the hospital or to communicate his condition to a medical provider.

277.    Where, as here, a patient presents with potentially life-threatening injuries and makes an explicit request for hospital care, the Paramedic Defendants' primary responsibility was to stabilize the patient while transporting him to the nearest qualified medical provider.

278.    The responsibility to transport is heightened where the Paramedics know they are making unqualified and unauthorized diagnoses.

279.    Absent a direct verbal order from their medical director, the Paramedic Defendants were not authorized to leave Mr. Burch at the HCDC.

280.    The Paramedic Defendants did not even speak with their medical director during the encounter with Mr. Burch.

281.    By declining to transport Mr. Burch to the hospital, the Paramedic Defendants abrogated their primary responsibility as transporters, denied Mr. Burch access to a qualified person who could evaluate his injuries, and prevented him from receiving the immediate medical care he required.

282.    The Paramedic Defendants also abrogated their duties as gatekeepers by delaying Mr. Burch's access to qualified medical providers.

283.    Assuming the Paramedic Defendants left Mr. Burch at the HCDC on the assumption that other unknown individual(s) would eventually fulfill the Paramedic

Defendants' own roles as gatekeepers and medical providers, the Paramedic Defendants made that assumption with no knowledge of when those individual(s) would take any action or that such action would be sufficient.

284. **Four days** would pass before Mr. Burch saw a medical provider in any clinical setting whatsoever—in this case a wholly inadequate teleconference visit.

285. By contrast, the Paramedic Defendants could have put Mr. Burch in the ambulance that was parked just outside of the HCDC, made the six-minute drive to Spanish Peaks Hospital, and given him same-day access to the immediate medical care he required.

286. Had the Paramedic Defendants connected Mr. Burch with medical care, he would not have died from the injuries he sustained at the HCDC.

### H. Captain LaPorte, as a Gatekeeper, Disregarded a Known Risk of Harm to Mr. Burch.

287. On March 28, 2023, Captain LaPorte became aware of a substantial risk to Mr. Burch's health and safety when Mr. Burch stated, accurately and repeatedly, that his ribs were "crushed," that they were "into" his body, that he was in serious pain, and that he needed to go to the hospital. Captain LaPorte was inside the small cell while Mr. Burch made these statements. His own body-worn camera footage captures these statements.

288. Adding to that awareness, Captain LaPorte understood that an able-bodied detention officer had just tackled an elderly man in a small cell rife with hard surfaces and jagged edges.

289. Any unfamiliarity with the serious risk to Mr. Burch's health was the result of Captain LaPorte's deliberate refusal to monitor a risk that he suspected to be true.

290.    Despite becoming aware of a substantial risk to Mr. Burch's health and safety, Captain LaPorte abrogated his duty as a gatekeeper.

291.    Captain LaPorte understood that the Paramedic Defendants provided no medical care whatsoever to Mr. Burch.

292.    After the Paramedic Defendants left the HCDC without Mr. Burch, Captain LaPorte understood that it was his responsibility to arrange for Health Care Partners staff to provide an additional evaluation and medical care, as he had informed the Paramedic Defendants that he would do.

293.    After the Paramedic Defendants left the HCDC, Captain LaPorte never arranged for Health Care Partners staff to evaluate and provide care to Mr. Burch.

294.    Instead, Captain LaPorte deliberately ignored Mr. Burch's injuries, and further blinded himself and everyone else to Mr. Burch by locking him in a cell with a broken, opaque window and then covering it with black plastic.

295.    Rather than facilitate Mr. Burch's care, Captain LaPorte prevented others from even monitoring him.

296.    In the days between the use of force and Mr. Burch's death, Captain LaPorte took no action to ensure that Mr. Burch would receive medical care.

### I. Officer Pino, as a Gatekeeper, Disregarded a Known Risk of Harm to Mr. Burch.

297.    On March 28, 2023, Officer Pino became aware of a substantial risk to Mr. Burch's health and safety when he slammed an elderly man into a metal bench.

298.    Officer Pino prepared a use of force report on March 28, 2023, in which he stated that he caused an injury to Mr. Burch's right ribcage.

299.    While Officer Pino pinned Mr. Burch to the floor, he heard Mr. Burch scream in excruciating pain, which became more pronounced when he pressed Mr. Burch onto his abdomen.

300.    Officer Pino heard Mr. Burch state, accurately and repeatedly, that his ribs were "crushed," that he was in serious pain, and that he needed to go to the hospital.

301.    In the days that followed, Officer Pino learned from the surveillance footage and during daily interactions that Mr. Burch's condition was worsening, as evidenced by Mr. Burch's sudden difficulty walking, his ongoing complaints regarding his injuries and serious pain, and his repeated requests for medical care. Officer Pino admitted that Mr. Burch's "whole demeanor changed" after his injury.

302.    Any unfamiliarity with the serious risk to Mr. Burch's health was the result of Officer Pino's deliberate refusal to monitor a risk that he suspected to be true. As examples, Officer Pino knew that Mr. Burch was locked in a cell where it was nearly impossible to adequately monitor him; performed pod checks too infrequently and often in a perfunctory manner; and willfully declined many opportunities to even glance at Mr. Burch's horrifically bruised torso, such as when he was taking a shower or standing shirtless in his cell.

303.    Despite becoming aware of a substantial risk to Mr. Burch's health and safety, Officer Pino abrogated his duty as a gatekeeper.

304.    Immediately after the use of force, Officer Pino was content with putting his knee into Mr. Burch's back, denying him access to CNA Sanders, a medical provider standing just feet away.

305.    During the encounter with the Paramedic Defendants, Officer Pino said **nothing** about the injury he knew he caused to Mr. Burch's right ribcage, even though he later admitted that he should have disclosed his own knowledge of Mr. Burch's rib injuries to the Paramedic Defendants.

306.    Officer Pino understood that the Paramedic Defendants provided no medical care whatsoever to Mr. Burch, and that it was his responsibility to arrange for Health Care Partners staff to provide an additional evaluation and medical care.

307.    After the Paramedic Defendants left the HCDC, Officer Pino never arranged for Health Care Partners staff to evaluate and provide care to Mr. Burch.

308.    Instead, Officer Pino deliberately ignored Mr. Burch's injuries, and further blinded himself and everyone else to Mr. Burch by locking him in a cell with a broken, opaque window and then covering it with black plastic.

309.    Rather than facilitate Mr. Burch's care, Officer Pino prevented himself and others from even monitoring him.

310.    In the days between the use of force and Mr. Burch's death, Officer Pino took no action to facilitate Mr. Burch's care.

### J. Captain Vigil, as a Gatekeeper, Disregarded a Known Risk of Harm to Mr. Burch.

311.    On March 28, 2023, Captain Vigil became aware of a substantial risk to Mr. Burch's health and safety when she watched Officer Pino tase Mr. Burch and slam him into a metal bench.

312.    While Officer Pino pinned Mr. Burch to the floor, Captain Vigil heard Mr. Burch scream in excruciating pain, which became more pronounced when Officer Pino pressed Mr. Burch onto his abdomen.

313.    Captain Vigil heard Mr. Burch state, accurately and repeatedly, that his ribs were "crushed," that he was in serious pain, and that he needed to go to the hospital.

314.    In the days that followed, Captain Vigil learned from the surveillance footage and during daily interactions that Mr. Burch's condition was worsening, as evidenced by Mr. Burch's sudden difficulty walking, his ongoing complaints regarding his injuries and serious pain, and his repeated requests for medical care. Captain Vigil admitted that Mr. Burch became "a different person" after his injury.

315.    Mr. Burch even said to Captain Vigil that he almost died in the night.

316.    Captain Vigil heard Mr. Burch repeat these complaints during the teleconference visit with NP Green on April 1, 2023.

317.    Any unfamiliarity with the serious risk to Mr. Burch's health was the result of Captain Vigil's deliberate refusal to monitor a risk that she suspected to be true. As examples, Captain Vigil knew that Mr. Burch was locked in a cell where it was nearly impossible to monitor him; performed pod checks too infrequently and often in a perfunctory manner; and willfully declined many opportunities to even glance at Mr. Burch's horrifically bruised torso, such as when he was taking a shower or standing shirtless in his cell.

318.    Despite becoming aware of a substantial risk to Mr. Burch's health and safety, Captain Vigil abrogated her duty as a gatekeeper.

319.    Immediately after the use of force, Captain Vigil was content with Officer Pino putting his knee into Mr. Burch's back, denying him access to CNA Sanders, a medical provider standing just feet away. Rather than facilitate further medical attention, Captain Vigil told CNA Sanders that Mr. Burch was "batshit."

320.    During the encounter with the Paramedic Defendants, Captain Vigil said nothing about the brutal violence and screams of pain that she had just observed.

321.    Captain Vigil understood that the Paramedic Defendants provided no medical care whatsoever to Mr. Burch, and that it was her responsibility to arrange for Health Care Partners staff to provide an additional evaluation and medical care.

322.    After the Paramedic Defendants left the HCDC, Captain Vigil did not arrange for Health Care Partners staff to evaluate and provide care to Mr. Burch.

323.    Instead, Captain Vigil deliberately ignored Mr. Burch's injuries and further blinded herself and everyone else to Mr. Burch by locking him in a cell with a broken, opaque window and then covering it with black plastic.

324.    Rather than facilitate Mr. Burch's care, Captain Vigil prevented herself and others from even monitoring him.

325.    In the afternoon on the same day of the use of force, Mr. Burch pleaded to Captain Vigil for help with the "pain," to which she falsely responded there was nothing she could do.

326.    Captain Vigil could and should have arranged for Health Care Partners staff to evaluate and provide care to Mr. Burch. Instead, she kept Mr. Burch locked in the cell.

327.    **Four days** passed before Captain Vigil even facilitated a teleconference visit. In and of itself, this delay constitutes deliberate indifference to Mr. Burch's health and safety.

328.    On April 1, 2023, Captain Vigil arranged for the single occasion in which any officer finally took Mr. Burch to see Health Care Partners staff, and even then, Captain Vigil did not tell NP Green why she had brought Mr. Burch to the teleconference visit, *i.e.*, he had been slammed by Officer Pino, had been complaining of his injuries and requesting to go to the hospital for days, and had stated that he almost died the previous night. Instead, Captain Vigil actively made it more difficult for NP Green to provide adequate care to Mr. Burch by making false statements regarding the safety risk he posed and keeping him in restraints.

329.    Captain Vigil understood that NP Green provided no medical care whatsoever to Mr. Burch.

330.    Captain Vigil understood that a teleconference visit was inadequate to assess Mr. Burch for rib injuries or internal bleeding, especially as there was not even a visual examination.

331.    Nevertheless, Captain Vigil did not arrange for any medical care between the teleconference visit on April 1, 2023, and his death on April 4, 2023.

### K. CNA Sanders and RN Simpson, as Both Gatekeepers and Medical Providers, Disregarded a Known Risk of Harm to Mr. Burch.

332.    On March 28, 2023, CNA Sanders became aware of a substantial risk to Mr. Burch's health and safety when she observed Officer Pino pinning Mr. Burch to the

ground, causing Mr. Burch to scream in excruciating pain, which became more pronounced when Officer Pino pressed Mr. Burch onto his abdomen.

333.   CNA Sanders learned shortly thereafter that an able-bodied detention officer had tackled an elderly man in a small cell rife with hard surfaces and jagged edges.

334.   CNA Sanders heard Mr. Burch state, accurately and repeatedly, that his ribs were "crushed," that he was in serious pain, and that he needed to go to the hospital.

335.   Upon information and belief, RN Simpson learned of the use of force against Mr. Burch, and Mr. Burch's injuries, by the following day.

336.   In the days that followed, CNA Sanders and RN Simpson learned from the surveillance footage and during daily interactions that Mr. Burch's condition was worsening, as evidenced by Mr. Burch's sudden difficulty walking, his ongoing complaints regarding his injuries and serious pain, and his repeated requests for medical care.

337.   Any unfamiliarity with the serious risk to Mr. Burch's health was the result of CNA Sanders and RN Simpson's deliberate refusal to monitor a risk that they suspected to be true. As examples, CNA Sanders and RN Simpson knew that Mr. Burch was locked in a cell where it was nearly impossible to monitor him; performed pod checks, rounds, and med passes too infrequently and in a perfunctory manner; willfully declined many opportunities to even glance at Mr. Burch's horrifically bruised torso, such as when he was taking a shower or standing shirtless in his cell; and did nothing to assess or investigate Mr. Burch's injuries.

338.   To the extent that they were medical providers, CNA Sanders and RN Simpson each abrogated the duty as a medical provider by failing to provide Mr. Burch medical care despite becoming aware of a substantial risk to Mr. Burch's health and safety.

339.    Immediately after the use of force, CNA Sanders stood in the doorway of the cell while Officer Pino pinned Mr. Burch to the ground but provided no medical care whatsoever. Instead, she accepted Captain Vigil's non-medical diagnosis that Mr. Burch was simply "batshit."

340.    During the encounter with the Paramedic Defendants, CNA Sanders did not assist in the Paramedic Defendants' provision of medical care, which itself was non-existent.

341.    CNA Sanders understood that the Paramedic Defendants provided no medical care to Mr. Burch, and that she (or another Health Care Partners staff member) was supposed to perform an additional evaluation and provide care.

342.    After the Paramedic Defendants left the HCDC, CNA Sanders did not provide any medical care.

343.    Between the use of force and Mr. Burch's death, neither CNA nor RN Simpson Sanders provided any medical care whatsoever.

344.    Despite becoming aware of a substantial risk to Mr. Burch's health and safety, CNA Sanders and RN Simpson also abrogated their duties as gatekeepers.

345.    CNA Sanders never took any action to escalate Mr. Burch's medical care.

346.    CNA Sanders did not encourage the Paramedic Defendants to take Mr. Burch to the Hospital and thereafter failed to arrange any other medical care.

347.    RN Simpson likewise failed to escalate Mr. Burch's medical care.

348.    CNA Sanders did not even arrange the single, woefully inadequate teleconference visit between Mr. Burch and NP Green that occurred on April 1, 2023.

349. CNA Sanders and RN Simpson both understood that NP Green provided no medical care whatsoever for Mr. Burch's injuries; nevertheless, neither CNA Sanders nor RN Simpson arranged for any medical care between the teleconference visit on April 1, 2023, and Mr. Burch's death on April 4, 2023.

350. In total, CNA Sanders did not arrange any medical care whatsoever.

351. RN Simpson was present for the teleconference visit but failed to escalate Mr. Burch's rib injuries before and during the visit, or, alternatively, failed to escalate Mr. Burch's rib injuries after it was clear that NP Green had failed to treat them.

### L. NP Green, as Both a Gatekeeper and a Medical Provider, Disregarded a Known Risk of Harm to Mr. Burch.

352. On April 1, 2023, NP Green was the attending provider during the teleconference visit with Mr. Burch.

353. Upon information and belief, before seeing Mr. Burch, NP Green learned through ongoing discussions with members at the HCDC that Officer Pino had slammed Mr. Burch and caused him crippling injuries.

354. Upon information and belief, NP Green also learned that Mr. Burch's condition was worsening, as evidenced by Mr. Burch's sudden difficulty walking, his ongoing complaints regarding his injuries and serious pain, and his repeated requests for medical care.

355. Despite becoming aware of a substantial risk to Mr. Burch's health and safety, NP Green abrogated her duties as a medical provider.

356.    Despite knowing that Mr. Burch complained of a traumatic rib injury, NP Green never properly assessed Mr. Burch and instead chose to conduct only a teleconference visit that was obviously inadequate to assess Mr. Burch's reported injuries and symptoms.

357.    Because she only saw Mr. Burch over teleconference, NP Green never conducted a physical examination of Mr. Burch.

358.    NP Green failed to auscultate Mr. Burch's lungs to check for diminished breath sounds.

359.    NP Green failed to monitor Mr. Burch's vital signs to detect signs of internal bleeding or respiratory compromise.

360.    NP failed to even perform an adequate visual examination of Mr. Burch's torso or back through the video camera.

361.    NP Green failed to order appropriate imaging, such as an x-ray.

362.    In sum, NP Green utterly failed to treat Mr. Burch's ribs or the underlying complications.

363.    Despite becoming aware of a substantial risk to Mr. Burch's health and safety, NP Green also abrogated her duties as a gatekeeper.

364.    NP Green never arranged for anyone to provide any medical care to Mr. Burch.

365.    Despite the obvious limitations of the teleconference visit with Mr. Burch, NP did not order any in-person follow-up care for Mr. Burch.

366.    Indeed, NP Green's notes of the teleconference visit relate solely to Mr. Burch's mental health, indicating that NP Green entirely disregarded Mr. Burch's injuries, and/or that RN Simpson and Captain Vigil utterly failed to escalate Mr. Burch's rib injuries and

related symptoms, such that the teleconference visit was focused only on Mr. Burch's mental health.

367.   NP Green understood that she did not even perform a visual examination of Mr. Burch's torso during the teleconference visit; nevertheless, NP Green did not arrange for any medical care between the teleconference visit on April 1, 2023, and his death on April 4, 2023.

## V. MUNICIPAL LIABILITY

### A. The Huerfano County Defendants Bear Legal Responsibility for Officer Pino's Excessive Force.

368.   The Huerfano County Defendants are responsible for the oversight, supervision, and training of employed officers, including Officer Pino, with respect to the use of force at the HCDC.

369.   ***Failure to Train on De-escalation***. The Huerfano County Defendants failed to train employed officers, including Officer Pino, on the de-escalation of encounters, particularly with individuals in a mental health crisis.

370.   As further evidence of Huerfano County Defendants' failure to train on de-escalation, the HCSO's use-of-force Policy ("UOF Policy") fails to guide officers on de-escalation.

371.   The UOF Policy has not been updated since 2014.

372.   The UOF Policy permits "non-deadly force" regardless of whether the officer has taken steps to avoid recklessly escalating an encounter with an individual in the midst of a mental crisis, a constitutional requirement.

373.    The UOF Policy defines "de-escalate" as "to use the **least amount of force** to stop the action of a violator and **reduce the amount of force** applied as the threat is neutralized or become compliant."

374.    Although the UOF Policy *defines* "de-escalate," the UOF Policy does not once mention the term elsewhere in its provisions regarding the use of "non-deadly force."

375.    The Huerfano County Defendants' decision to *promote* Officer Pino just two months after using reckless and excessive force, ultimately causing the death of a detainee, is further indication that Officer Pino's actions were within, or pursuant to, the Huerfano County Defendants' inadequate training on de-escalation.

376.    The UOF Policy describes the topics on which the Huerfano County Defendants train employed officers—absent from the topics is any training specifically on crisis intervention techniques or any other technique consistent with the constitutional or industry standard approach to individuals in crisis.

377.    Even if the Huerfano County Defendants did offer any such training (which they do not), the Huerfano County Defendants' training programs are haphazard and functionally non-existent.

378.    For instance, the Huerfano County Defendants employed Officer Pino in August of 2022 on the bare requirements that he was 21 years old and had a high school diploma or GED—the Huerfano County Defendants knew that Officer Pino was not a graduate of any law enforcement academy. Accordingly, the extent of Officer Pino's law enforcement training prior to the use of excessive force on March 28, 2023, if any, would have come directly from the Huerfano County Defendants.

379.    However Huerfano County Defendants did not provide Officer Pino with any meaningful training.

380.    In interviews with the Colorado Bureau of Investigation ("CBI"), other HCSO officers explained that the Huerfano County Defendants do not train officers when they are hired or perform any form of orientation with the department's policies. One officer admitted that he had been forced to ask *former* HCSO officers about how to complete daily tasks.

381.    Another HCSO officer made similar admissions: "just uh, hands-on training … not much … we still have [] some training that [the Huerfano County Defendants] plan on putting us through, **but they haven't gotten to it yet**."

382.    Because of the Huerfano County Defendants' failure to train, Officer Pino recklessly escalated and used excessive force during the encounter with Mr. Burch on March 28, 2023.

383.    The Huerfano County Defendants were deliberately indifferent in failing to train Officer Pino because the scenario at issue—use of force against a person having a mental health crisis—is a common and recurring situation in correctional facilities, and the failure to train on such presents an obvious potential to violate the Constitution.

384.    The Huerfano County Defendants were deliberately indifferent in failing to train Officer Pino because they knew of the need to train on de-escalation from prior violations at the HCDC caused by a lack of de-escalation.

385.    On or around May 3, 2021, HCSO Officers Morgan Chapman and Scott Eckhardt were involved in a highway pursuit and eventually a collision with Travis Foutch in Huerfano County. The collision caused serious injuries to Officer Eckhardt who

received immediate medical care. The collision also caused serious injuries to Mr. Foutch who, by contrast, was booked into custody at the HCDC and locked in a cell without first having been evaluated at any medical facility. Hours later, HCSO Officers Joseph Bernal and Roman Hijar walked to Mr. Foutch's cell, drew their tasers, and opened the door. Mr. Foutch remained standing in the back of the cell, totally naked, posing no threat to himself or any third person. Further, Mr. Foutch had likely suffered a concussion and/or was in shock from the earlier collision, making it difficult for him to comprehend the officers' rapid escalation. Officer Bernal then deployed the taser against Mr. Foutch at least **eight** times, causing debilitating pain. Officer Bernal continued to tase Mr. Foutch even as he was handcuffed and prone. Officer Bernal engaged in this excessive force to punish Mr. Foutch in retaliation for his involvement in the earlier injuries to Officer Eckhardt. Upon information and belief, the Huerfano County Defendants did not discipline Officer Bernal for the excessive force. Upon information and belief, the practice of engaging in excessive force, recklessly escalating encounters with inmates in crisis, and refusing to investigate or discipline officers who engage in such conduct remained in place through the death of Mr. Burch.

### B. The Huerfano County Defendants Bear Legal Responsibility for the Officer Defendants' Deliberate Indifference to Mr. Burch's Serious Medical Needs.

386.    The Huerfano County Defendants are responsible for the oversight, supervision, and training of employed officers, including the Officer Defendants, with respect to their gatekeeping functions at the HCDC.

387.    ***Failure to Train on Elevating Medical Care.*** The Huerfano County Defendants failed to train employed officers, including the Officer Defendants, on their

gatekeeping obligations, including determining the immediacy of medical complaints and elevating medical care.

388.    Indeed, the sheer number of officers and employees who ignored their duty to provide Mr. Burch with medical attention shows the widespread nature of the Huerfano County Defendants' failures to train.

389.    As further evidence of their failure to train, the Huerfano County Defendants do not maintain any policies delineating the constitutionally mandated gatekeeping functions of their employed officers, including determining the immediacy of medical complaints and elevating medical care.

390.    Relatedly, the Huerfano County Defendants do not maintain any specific policies regarding how their employed officers must exercise their gatekeeping functions with respect to detainees experiencing mental crises.

391.    Such individuals may only experience moments of passing lucidity where they may advocate for their own health and safety. More often, such individuals present a heightened need for gatekeepers who must act on their behalf.

392.    In addition to failing to provide any training or guidance to their officers, the Huerfano County Defendants have also actively refused any opportunities for their officers to receive such training.

393.    For instance, Health Care Partners described the Huerfano County Defendants' stance on training leading up to the deliberately indifferent killing of Mr. Burch: "There is a tremendous amount of turnover in detention staff [at the HCDC], and **our constant offers for facility training were denied and/or ignored** [by the Huerfano County Defendants]."

394.    Indeed, just months after the death of Mr. Burch, Health Care Partners terminated its contract with the Huerfano County Defendants and ceased providing medical services at HCDC precisely because of Huerfano County Defendants' longstanding refusal to train its officers: "We feel **the lack of knowledge of your staff** on how a medical unit operates ... **has continued** to create a tremendous liability issue for our staff and providers in delivering the highest quality of care for the jail patients."

395.    As described above, even if the Huerfano County Defendants did offer any such training (which they do not), the Huerfano County Defendants' training programs are haphazard and functionally non-existent such that detention officers are not trained to carry out the bedrock constitutional obligations of their profession.

396.    Because of the Huerfano County Defendants' failure to train, the Officer Defendants repeatedly denied and delayed Mr. Burch access to qualified medical providers. Instead, the Officer Defendants collectively assumed he was "batshit."

397.    The Huerfano County Defendants were deliberately indifferent by refusing to train their employed officers on the constitutional mandates regarding their gatekeeping functions.

398.    It was common, likely, foreseeable, and predictable that employed officers would be required to exercise their gatekeeping functions at the HCDC, particularly in scenarios involving detainees in crisis.

399.    Huerfano County Defendants were also aware of the inadequacy of their training from similar prior violations by inadequately trained employees.

400.    In March of 2011, Raymond Montoya, an inmate at the HCDC, became increasingly ill in custody. He was coughing up bloody phlegm, having frequent sweats,

struggling to eat, urinating abnormal colors, and experiencing pain. HCSO Officer Larry Garbiso became aware of these symptoms and the immediate need for medical attention but nevertheless delayed or completely failed to arrange the examination of Mr. Montoya by any medical provider. Upon information and belief, the Huerfano County Defendants did not discipline Officer Garbiso for his deliberate indifference to an inmate's serious medical needs. Upon information and belief, the practice of delaying and otherwise denying medical care to inmates who display symptoms of serious medical conditions, as well as the practice of refusing to investigate or discipline officers who engage in such conduct, remained in place through the death of Mr. Burch.

401.    In March of 2001, the American Civil Liberties Union ("ACLU"), acting on behalf of seven inmates at the HCDC, issued a letter to the Huerfano County Defendants asserting that the inmates were experiencing health complications resulting from improper ventilation, molding, and other related issues. Approximately **ten years later**, the Huerfano County Defendants coordinated an inspection and attempted to remediate the massive amounts of mold present at the HCDC. One molded area spanned an entire pod, approximately 1,800 square feet. Notably, the Huerfano County Defendants' belated action was not in response to the ACLU letter; rather, the Huerfano County Defendants only decided a response was necessary when their own detention staff submitted a similar letter, complaining of the "black mold that is growing in the cells." Upon information and belief, the practice of ignoring serious risks to the health of inmates remained in place through the death of Mr. Burch.

### C. The Huerfano County Defendants and Health Care Partners Bear Legal Responsibility for the Medical Staff Defendants' Deliberate Indifference to Mr. Burch's Serious Medical Needs.

402.    The Huerfano County Defendants have a non-delegable duty to provide constitutionally adequate medical services to detainees at the HCDC.

403.    The Huerfano County Defendants contracted, via express written agreement, for Health Care Partners to provide those non-delegable medical services at the HCDC.

404.    As such, under the non-delegable duty doctrine, the Huerfano County Defendants are liable for Health Care Partners' unconstitutional policies and practices described below.

405.    Health Care Partners was responsible for the oversight, supervision, and training of the medical staff at HCDC, including the Medical Staff Defendants.

406.    ***Failure to Train on Elevating Medical Care.*** Health Care Partners failed to adequately train medical staff, including the Medical Staff Defendants, on determining the immediacy of medical complaints and elevating medical care.

407.    As evidenced by their utter failure to assess Mr. Burch's injuries and appropriately elevate his medical care, Health Care Partners did not provide its employees with any training or guidance on how to do so.

408.    Because of Health Care Partners' failure to train, the Medical Staff Defendants repeatedly failed to treat Mr. Burch and denied and delayed him access to  access to qualified medical providers. Instead, the Medical Staff Defendants accepted the collective diagnosis that Mr. Burch was just "batshit."

409.    Health Care Partners was deliberately indifferent by refusing to train its medical staff on their constitutionally mandated treatment and gatekeeping functions.

410.    It was common, likely, foreseeable, and predictable that jail medical staff would be required to exercise their treatment and gatekeeping functions at the HCDC in use-of-force scenarios, particularly those involving detainees in crisis.

411.    ***Unconstitutional Policy or Custom of Understaffing and Inappropriate Use of Teleconference Visits***. Health Care Partners also maintained a policy or custom of understaffing the medical staff of the HCDC and of inappropriately using teleconference visits.

412.    Upon information and belief, Health Care Partners staffed the HCDC in such a way that there were no medical providers available for in-person visits at the jail.

413.    Instead, only nurses or nurses aides worked at the HCDC—neither or whom are qualified to make a medical diagnosis of a patient's condition.

414.    Upon information and belief, Health Care Partners also did not maintain a medical provider who was on call and available to visit the HCDC.

415.    Instead, HCDC had a policy or custom of relying on remote teleconference visits in place of in-person medical assessments.

416.    Health Care Partners CEO, Rita Torres, stated to CBI investigators that it was the "standard practice" of Health Care Partners to assess patients by teleconference.

417.    Health Care Partners maintained its policy or custom of understaffing the medical staff of the HCDC and of inappropriately using teleconference visits with deliberate indifference to the risk of injury and violation of Constitutional rights that such policies or customs posed.

418.   It was obvious that understaffing a jail's medical unit and relying on teleconferencing in place of in-person assessments by medical providers had the potential to lead to violations of the Constitution.

419.   Health Care Partners knew that teleconference visits are inadequate to properly assess or treat many kinds of medical issues, including traumatic injuries.

420.   Health Care Partners also knew that its operations at the HCDC posed "a tremendous liability issue" because patients were receiving inadequate medical care.

### D. Spanish Peaks Bears Legal Responsibility for the Paramedic Defendants' Deliberate Indifference to Mr. Burch's Serious Medical Needs.

421.   Spanish Peaks was responsible for the oversight, supervision, and training of paramedics providing emergency medical services at the HCDC, including the Paramedic Defendants.

422.   ***Failure to Train on Scope of Practice and Elevating Medical Care.*** Spanish Peaks failed to train paramedics, including the Paramedic Defendants, on the limitations of their scope of practice and their primary responsibility as gatekeepers (not off-the-cuff medical providers), including determining the immediacy of medical complaints and elevating medical care.

423.   Spanish Peaks failed to train paramedics, including the Paramedic Defendants, on the particular attention required when tending to individuals in crisis. As described above, such individuals require more care and advocacy from medical professionals, not less.

424.   Because of Spanish Peaks' failure to train, the Paramedic Defendants failed to treat Mr. Burch and denied and delayed him access to qualified medical providers.

425.    Instead, the Paramedic Defendants engaged in possibly the single-most damaging conduct to Mr. Burch's health: they announced the unfounded, unqualified, unauthorized, and patently incorrect diagnosis that Mr. Burch's circumstances were "absolutely not" an emergency. He was "fine."

426.    Spanish Peaks was deliberately indifferent by refusing to train paramedics on their constitutionally mandated treatment and gatekeeping functions.

427.    It was common, likely, foreseeable, and predictable that paramedics would encounter patients with potential injuries that the paramedics were unqualified and unauthorized to diagnose.

## VI.  STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of 42 U.S.C. § 1983**
**Excessive Force Violating the Fourteenth Amendment**
**(Against Defendant Pino)**

428.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

429.    Mr. Burch enjoyed the clearly established right to be free from punitive and excessive force under the Fourteenth Amendment to the United States Constitution.

430.    The totality of the circumstances alleged herein establish that Defendant Pino's use of force against Mr. Burch was objectively unreasonable.

431.    The circumstances alleged required no use of force.

432.    Even with the tenuous assumption that Defendant Pino had a legitimate interest in immediately removing the pencil from Mr. Burch's possession, that interest still did not justify rushing towards Mr. Burch, threatening him, tasing him, precipitating a scuffle,

tackling him into a metal bench with enough force to break six ribs, and then continuing to use force and further injuring Mr. Burch after he was restrained and lying on the floor of his cell.

433.    Mr. Burch died as a result of Defendant Pino's excessive force.

434.    Defendant Pino bypassed several reasonable alternatives, *i.e.*, just monitor Mr. Burch or employ a de-escalation effort.

435.    At the time Defendant Pino used force, no security threat existed, and there was no threat of harm to Mr. Burch, Defendant Pino, or any third person.

436.    Mr. Burch did not display any active resistance. The only minor act of self-defense occurred after Defendant Pino unjustifiably tased him.

437.    Defendant Pino recklessly created the need for force by employing an aggressive, threatening, and violent approach to circumstances involving a mentally ill individual.

438.    Beyond excessive, Defendant Pino's force was also objectively and subjectively punitive. His force bore no rational relationship to any legitimate government interest. His force was done with the express or inferred intent to punish Mr. Burch.

439.    Defendant Pino's conduct violated clearly established rights belonging to Mr. Burch of which any reasonable detention officer knew or should have known.

440.    Defendant Pino's unlawful acts were carried out pursuant to the policies, customs, and practices of the Huerfano County Defendants.

441.    Defendant Pino's conduct, as described herein, was attended by circumstances of malice, or willful and wanton conduct, which he must have realized was

dangerous, and/or he acted heedlessly and recklessly without regard to Mr. Burch's constitutionally protected rights.

442.    As a direct result of Defendant Pino's unlawful actions and omissions described here, Plaintiff Estate of Michael Burch suffered actual injuries, damages, and losses.

**SECOND CLAIM FOR RELIEF**
**Violation of C.R.S. § 13-21-131**
**Excessive Force Violating Colo. Const. Article II, Section 7**
**(Against Defendant Pino)**

443.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

444.    Defendant Pino is, and was at all relevant times, a "peace officer" as defined by C.R.S. § 24-31-901(3) and therefore subject to C.R.S. § 13-21-131.

445.    As described herein, Defendant Pino unlawfully used excessive force against Mr. Burch, by tasing him, tackling him, and continuing to use force and further injuring Mr. Burch after he was restrained and lying on the floor of his cell.

446.    The totality of the circumstances alleged herein establish that Defendant Pino's use of force against Mr. Burch was objectively unreasonable.

447.    Defendant Pino's conduct, as described herein, was attended by circumstances of malice, or willful and wanton conduct, which he must have realized was dangerous, and/or he acted heedlessly and recklessly without regard to Mr. Burch's constitutionally protected rights.

448.    As a direct result of Defendant Pino's unlawful actions and omissions described here, Plaintiff Estate of Michael Burch suffered actual injuries, damages, and losses.

### THIRD CLAIM FOR RELIEF
**Violation of 42 U.S.C. § 1983**
**Failure to Intervene in Defendant Pino's Excessive Force**
**(Against Defendant Vigil)**

449.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

450.    Defendant Vigil supervised Defendant Pino's conduct with respect to Mr. Burch.

451.    Defendant Vigil was present during Defendant Pino's reckless escalation and unlawful use of force, as alleged in greater detail herein.

452.    Defendant Vigil could have prevented or stopped Defendant Pino's reckless escalation and unlawful use of force.

453.    Instead, Defendant Vigil failed to take any action to prevent or stop Defendant Vigil's reckless escalation and unlawful use of force.

454.    Defendant Vigil's conduct, as described herein, was attended by circumstances of malice, or willful and wanton conduct, which she must have realized was dangerous, and/or she acted heedlessly and recklessly without regard to Mr. Burch's constitutionally protected rights.

455.    As a direct result of Defendant Vigil's unlawful actions and omissions described here, Plaintiff Estate of Michael Burch suffered actual injuries, damages, and losses.

### FOURTH CLAIM FOR RELIEF
**Violation of C.R.S. § 13-21-131**
**Failure to Intervene in Excessive Force Violating Colo. Const. Article II, Section 7**
**(Against Defendant Vigil)**

456.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

457.    Defendant Vigil is, and was at all relevant times, a "peace officer" as defined by C.R.S. § 24-31-901(3) and therefore subject to C.R.S. § 13-21-131.

458.    As alleged herein, Defendant Vigil could have prevented or stopped Defendant Pino's reckless escalation and unlawful use of force, but failed to do so.

459.    Defendant Vigil's conduct, as described herein, was attended by circumstances of malice, or willful and wanton conduct, which she must have realized was dangerous, and/or she acted heedlessly and recklessly without regard to Mr. Burch's constitutionally protected rights.

460.    As a direct result of Defendant Vigil's unlawful actions and omissions described here, Plaintiff Estate of Michael Burch suffered actual injuries, damages, and losses.

**FIFTH CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983**
**Failure to Train Regarding De-escalation**
**(Against the Huerfano County Defendants)**

461.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

462.    As alleged herein, the Huerfano County Defendants maintained an unconstitutional policy, practice, or custom of failing to adequately train its officers on de-escalation.

463.    The Huerfano County Defendants' failure to adequately train its officers on de-escalation was a moving force behind Officer Pino's excessive force against Mr. Burch, and a proximate cause of Plaintiff's injuries.

464.   The Huerfano County Defendants maintained their inadequate training with deliberate indifference to the constitutional rights of Mr. Burch despite the obvious, known, and highly predictable dangers created by such failures.

### SIXTH CLAIM FOR RELIEF
**Violation of 42 U.S.C. § 1983**
**Deliberate Indifference to Medical Needs**
**Violating the Fourteenth Amendment**
**(Against Defendants Pino, Vigil, and LaPorte)**

465.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

466.   Mr. Burch enjoyed the clearly established right under the Fourteenth Amendment to the United States Constitution to be free from deliberate indifference to his known serious medical needs.

467.   Mr. Burch's death, along with the preceding symptoms, were sufficiently and objectively serious.

468.   Defendants Pino, Vigil, and LaPorte each became aware of a serious risk to Mr. Burch's health and safety or otherwise consciously disregarded a risk they suspected to be true.

469.   Nevertheless, as alleged herein, Defendants Pino, Vigil, and LaPorte each prevented Mr. Burch's treatment or denied Mr. Burch access to a medical professional capable of evaluating the need for treatment.

470.   Defendants Pino, Vigil, and LaPorte's conduct violated clearly established rights that belonged to Mr. Burch of which they reasonably knew or should have known.

471.   Defendants Pino, Vigil, and LaPorte's conduct, as described herein, was attended by circumstances of malice, or willful and wanton conduct, which they must have

realized was dangerous, and/or they acted heedlessly and recklessly without regard to Mr. Burch's constitutionally protected rights.

472.    As a direct result of Defendants Pino, Vigil, and LaPorte's unlawful actions and omissions described here, Plaintiff Estate of Michael Burch suffered actual injuries, damages, and losses.

**SEVENTH CLAIM FOR RELIEF**
**Violation of C.R.S. § 13-21-131**
**Deliberate Indifference to Medical Needs**
**Violating Colo. Const. Article II, Section 25**
**(Against Defendants Pino, Vigil, and LaPorte)**

473.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

474.    Defendants Pino, Vigil, and LaPorte are, and were at all relevant times, "peace officers" as defined by C.R.S. § 24-31-901(3) and therefore subject to C.R.S. § 13-21-131.

475.    As described herein, Defendants Pino, Vigil, and LaPorte were each deliberately indifferent to Mr. Burch's serious medical needs and prevented Mr. Burch's treatment or denied Mr. Burch access to a medical professional capable of evaluating the need for treatment.

476.    Defendants Pino, Vigil, and LaPorte's conduct, as described herein, was attended by circumstances of malice, or willful and wanton conduct, which they must have realized was dangerous, and/or they acted heedlessly and recklessly without regard to Mr. Burch's constitutionally protected rights.

477.   As a direct result of Defendants Pino, Vigil, and LaPorte's unlawful actions and omissions described here, Plaintiff Estate of Michael Burch suffered actual injuries, damages, and losses.

### EIGHTH CLAIM FOR RELIEF
**42 U.S.C. § 1983**
**Failure to Train Regarding Determining the Immediacy of Medical Care and Elevating Medical Care**
**(Against the Huerfano County Defendants)**

478.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

479.   As alleged herein, the Huerfano County Defendants maintained an unconstitutional policy, practice, or custom of failing to adequately train its officers on determining the immediacy of medical care and elevating medical care.

480.   The Huerfano County Defendants' failure to adequately train its officers on determining the immediacy of medical care and elevating medical care was a moving force behind Defendants Pino, Vigil, and LaPorte's deliberate indifference to Mr. Burch's medical needs, and a proximate cause of Plaintiff's injuries.

481.   The Huerfano County Defendants maintained their inadequate training with deliberate indifference to the constitutional rights of Mr. Burch despite the obvious, known, and highly predictable dangers created by such failures.

### NINTH CLAIM FOR RELIEF
**Violation of 42 U.S.C. § 1983**
**Deliberate Indifference to Medical Needs**
**Violating the Fourteenth Amendment**
**(Against Defendants Sanders and Simpson)**

482.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

483.    Mr. Burch's death, along with the preceding symptoms, were sufficiently and objectively serious.

484.    Defendants Sanders and Simpson each became aware of a serious risk to Mr. Burch's health and safety or otherwise consciously disregarded a risk they suspected to be true.

485.    Nevertheless, as alleged herein, Defendants Sanders and Simpson each prevented Mr. Burch's treatment or denied Mr. Burch access to a medical professional capable of evaluating the need for treatment.

486.    Defendants Sanders and Simpson each also failed to properly treat Mr. Burch's injuries.

487.    Defendants Sanders and Simpson's conduct violated clearly established rights that belonged to Mr. Burch of which they reasonably knew or should have known.

488.    Defendants Sanders and Simpson's conduct, as described herein, was attended by circumstances of malice, or willful and wanton conduct, which they must have realized was dangerous, and/or they acted heedlessly and recklessly without regard to Mr. Burch's constitutionally protected rights.

489.    As a direct result of Defendants Sanders and Simpson's unlawful actions and omissions described here, Plaintiff Estate of Michael Burch suffered actual injuries, damages, and losses.

**TENTH CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983**
**Failure to Train Regarding Determining the Immediacy of Medical Care**
**and Elevating Medical Care**
**(Against Health Care Partners and the Huerfano County Defendants)**

490.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

491.    Under the non-delegable duty doctrine, the Huerfano County Defendants are liable for Health Care Partners' unconstitutional policies, practices, and customs.

492.    As alleged herein, Health Care Partners maintained an unconstitutional policy, practice, or custom of failing to adequately train its employees on determining the immediacy of medical care and elevating medical care.

493.    Health Care Partners' failure to adequately train its employees on determining the immediacy of medical care and elevating medical care was a moving force behind Defendants Sanders and Simpson's deliberate indifference to Mr. Burch's medical needs, and a proximate cause of Plaintiff's injuries.

494.    Health Care Partners maintained its inadequate training with deliberate indifference to the constitutional rights of Mr. Burch despite the obvious, known, and highly predictable dangers created by such failures.

**ELEVENTH CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983**
**Deliberate Indifference to Medical Needs**
**Violating the Fourteenth Amendment**
**(Against Defendant Green)**

495.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

496.    Mr. Burch's death, along with the preceding symptoms, were sufficiently and objectively serious.

497.    Defendant Green became aware of a serious risk to Mr. Burch's health and safety or otherwise consciously disregarded a risk she suspected to be true.

498.    Nevertheless, as alleged herein, Defendant Green failed to properly treat Mr. Burch's injuries.

499.    Defendant Green's conduct violated clearly established rights that belonged to Mr. Burch of which she reasonably knew or should have known.

500.    Defendant Green's conduct, as described herein, was attended by circumstances of malice, or willful and wanton conduct, which she must have realized was dangerous, and/or she acted heedlessly and recklessly without regard to Mr. Burch's constitutionally protected rights.

501.    As a direct result of Defendant Green's unlawful actions and omissions described here, Plaintiff Estate of Michael Burch suffered actual injuries, damages, and losses.

## TWELFTH CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983
### Unconstitutional Policy or Custom of Understaffing
### and Inappropriate Use of Teleconferences
### (Against Health Care Partners and the Huerfano County Defendants)

502.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

503.    As alleged herein, Health Care Partners maintained an unconstitutional policy, practice, or custom of understaffing and of inappropriately using teleconference visits.

504.    Health Care Partners' policy, practice, or custom of understaffing and of inappropriately using teleconference visits was a moving force behind Defendant Green's deliberate indifference to Mr. Burch's medical needs, and a proximate cause of Plaintiff's injuries.

505.    Health Care Partners maintained its policy, practice, or custom of understaffing and of inappropriately using teleconference visits with deliberate indifference to the constitutional rights of Mr. Burch despite the obvious, known, and highly predictable dangers created by such failures.

### THIRTEENTH CLAIM FOR RELIEF
**Violation of 42 U.S.C. § 1983**
**Deliberate Indifference to Medical Needs**
**Violating the Fourteenth Amendment**
**(Against Defendants Trujillo and Martinez)**

506.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

507.    At all relevant times, Defendants Trujillo and Martinez were acting under color of state law in exercising the traditional state function of providing medical care to inmates and detainees in a jail.

508.    Mr. Burch's death, along with the preceding symptoms, were sufficiently and objectively serious.

509.    Defendants Trujillo and Martinez each became aware of a serious risk to Mr. Burch's health and safety or otherwise consciously disregarded a risk they suspected to be true.

510.    Nevertheless, as alleged herein, Defendants Trujillo and Martinez each prevented Mr. Burch's treatment or denied Mr. Burch access to a medical professional capable of evaluating the need for treatment.

511.    Defendants Trujillo and Martinez's conduct violated clearly established rights that belonged to Mr. Burch of which they reasonably knew or should have known.

512.    Defendants Trujillo and Martinez's conduct, as described herein, was attended by circumstances of malice, or willful and wanton conduct, which they must have realized was dangerous, and/or they acted heedlessly and recklessly without regard to Mr. Burch's constitutionally protected rights.

513.    As a direct result of Defendants Trujillo and Martinez's unlawful actions and omissions described here, Plaintiff Estate of Michael Burch suffered actual injuries, damages, and losses.

## FOURTEENTH CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983
### Failure to Train Regarding Determining the Immediacy of Medical Care, Elevating Medical Care, and the Scope of Practice
### (Against Defendant Spanish Peaks)

514.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

515.    As alleged herein, Spanish Peaks maintained an unconstitutional policy, practice, or custom of failing to train paramedics on the limitations of their scope of practice and on determining the immediacy of medical complaints and elevating medical care.

516.    Spanish Peaks' failure to adequately train its employees on determining the immediacy of medical care and elevating medical care was a moving force behind

Defendants Trujillo and Martinez's deliberate indifference to Mr. Burch's medical needs, and a proximate cause of Plaintiff's injuries.

517.    Spanish Peaks maintained its inadequate training with deliberate indifference to the constitutional rights of Mr. Burch despite the obvious, known, and highly predictable dangers created by such failures.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in its favor and against each of the Defendants, and award it all relief allowed by law, including but not limited to the following:

(a) All appropriate relief at law and equity;

(b) Declaratory relief and other appropriate equitable relief;

(c) Economic losses on all claims as allowed by law;

(d) Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(e) Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(f) Attorneys' fees and the costs associated with this action, including expert witness fees on all claims allowed by law;

(g) Pre- and post-judgment interest at the appropriate lawful rate; and

(h) Any further relief that this court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 26th day of March 2025.

/s/ Omeed Azmoudeh
Omeed Azmoudeh
Felipe Bohnet-Gomez
Matthew Cron
Stephanie Wise
Katie Wiese Valiant
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street, Suite 100
Denver, CO 80205
(303) 578-4400 (p)
(303) 578-4401 (f)
oa@rmlawyers.com
fbg@rmlawyers.com
mc@rmlawyers.com
sw@rmlawyers.com
kw@rmlawyers.com


/s/ Adam J. Schultz
Adam J. Schultz
The Law Office of Adam J. Schultz
211 W. Abriendo Avenue
Pueblo, CO 81004
(719) 542 9559 (p)
adam@aschultzlaw.com